**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| MARSHALL JEAN SHANTENA LEVERETTE,<br><br>Plaintiff,<br><br>vs.<br><br>ANGIODYNAMICS, INC. & NAVILYST MEDICAL, INC.,<br><br>Defendants. | Case No.:  2:25-cv-00045<br><br>**COMPLAINT FOR DAMAGES**<br><br>**(1) NEGLIGENCE**<br>**(2) DESIGN DEFECT**<br>**(3) FAILURE TO WARN**<br>**(4) BREACH OF IMPLIED WARRANTY**<br>**(5) BREACH OF EXPRESS WARRANTY**<br>**(6) FRAUDULENT CONCEALMENT**<br>**(7) VIOLATION OF THE OHIO**<br>**PRODUCT LIABILITY ACT**<br><br>**DEMAND FOR JURY TRIAL** |

**COMPLAINT**

**COMES NOW** Plaintiff MARSHALL JEAN SHANTENA LEVERETTE, by and through the undersigned counsel, and for her Complaint against AngioDynamics, Inc. and Navilyst Medical, Inc., (collectively, the "Defendants"), and alleges as follows:

1.  This is an action for damages arising out of failures relating to the Defendants' design, development, testing, assembling, manufacturing, packaging, promoting, marketing, distribution, supplying, and/or selling the defective implantable vascular access device sold under the trade name of SmartPort (hereinafter "SmartPort" or "port-a-cath").

**PARTIES**

2.  MARSHALL JEAN SHANTENA LEVERETTE ("Plaintiff" or "MARSHALL LEVERETTE") is an adult citizen and resident of Houston County, Alabama. Plaintiff was implanted with the Defendants' SmartPort product for the purposes of chemotherapy; Plaintiff

– 1 –

COMPLAINT

sustained serious injuries due to the defective SmartPort and due to the Defendants' tortious conduct, as shown below in the main body of this Complaint.

3. Defendant AngioDynamics, Inc. ("AngioDynamics") is a Delaware corporation with its principal place of business located in Latham, New York. AngioDynamics is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, its medical devices, including the SmartPort.

4. Defendant Navilyst Medical, Inc. ("Navilyst") is a Delaware corporation with its principal place of business located in Marlborough, Massachusetts. Navilyst conducts business throughout the United States, including the State of Ohio, and is a wholly owned subsidiary of AngioDynamics. Navilyst is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, its medical devices, including the SmartPort.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over the parties pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and cost.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 by virtue of the facts that (a) a substantial part of the events or omissions giving rise to the claims occurred in this District, and (b) the Defendants' products are produced, sold to, and consumed by individuals in the State of Ohio and in this District, thereby subjecting the Defendants to personal jurisdiction in

– 2 –

COMPLAINT

this action and making them all "residents" of this judicial District.

7. The Defendants have and continue to conduct substantial business in the State of Ohio and in this District, distribute vascular access products in this District, receive substantial compensation and profits from sales of vascular access products in this District, and made material omissions and misrepresentations and breaches of warranties in this District, to subject them to *in personam* jurisdiction in this District.

8. Consistent with the Due Process Clause of the Fifth and Fourteenth Amendments, this Court has *in personam* jurisdiction over the Defendants because the Defendants are present in the State of Ohio, such that requiring an appearance does not offend traditional notices of fair and substantial justice.

## PRODUCT BACKGROUND

9. In or about 2007, a company called Rita Medical Systems, Inc. received clearance via the 510(k) Premarket Notification Program from the Food and Drug Administration (FDA) to market and sell a product called Vortex® Port Access System.

10. When later, AngioDynamics completed the acquisition of the assets and liabilities of Rita Medical Systems, Inc., AngioDynamics rebranded the subject product as SmartPort.

11. Defendants' Vascular Access Devices were designed, patented, manufactured, labeled, marketed, sold, and distributed by the Defendants at all times relevant to this action.

12. SmartPort is one of several varieties of port/catheter systems that has been designed, manufactured, marketed, and sold by the Defendants.

COMPLAINT

13.    According to the Defendants, SmartPort is a totally implantable vascular access device designed to provide repeated access to the vascular system for the delivery of medications, intravenous fluids, parenteral nutrition solutions, and blood products.

14.    The intended purpose of SmartPort is to make it easier to deliver medications directly into the patient's bloodstream. The device is surgically placed completely under the skin and left implanted.

15.    Upon information and belief, SmartPort, in this case, is a system consisting of two primary components: an injection port and a polyurethane catheter which includes additives intended to make it radiopaque.

16.    The injection port has a raised center, or "septum," where the needle is inserted for delivery of the medication(s). The medication is carried from the port into the bloodstream through a small, flexible tube, called a catheter, which is inserted into a blood vessel.

17.    SmartPort is indicated for patient therapies requiring repeated access to the vascular system. The port system can be used for infusion of medications, I.V. fluids, parenteral nutrition solutions, blood products, and for the withdrawal of blood samples.

18.    Upon information and belief, the product's catheter is comprised of a polymeric mixture of polyurethane and a barium sulfate radiopacity agent.

19.    Barium sulfate is known to contribute to reduction of the mechanical integrity of polyurethane *in vivo* as the particles of barium sulfate dissociate from the surface of the catheter over time, leaving microfractures and other alterations of the polymeric structure and degrading the mechanical properties of the polyurethane.

COMPLAINT

20.    Researchers have shown that catheter surface degradation in products featuring a radiopaque barium sulfate stripe is concentrated at the locus of the stripe.[1]

21.    The design of the product at issue includes a catheter with a stripe containing a stripe with a higher concentration of barium sulfate than the rest of the catheter.

22.    According to relevant medical literature, such design is proven to have a higher rate of the port-a-cath-related thrombosis than catheters without the barium-loaded stripe.

23.    The mechanical integrity of barium sulfate-impregnated polyurethane is affected by the concentration of barium sulfate as well as the heterogeneity of the modified polymer.

24.    Upon information and belief, the Defendants' manufacturing process in designing and constructing the catheter implanted in Plaintiff involved too high a concentration of barium sulfate particles for the polymer formulation, leading to improperly high viscosity of the admixed polyurethane before polymerization and causing improper mixing of barium sulfate particles within the polymer matrix.

25.    This defect in the manufacturing process led to a heterogeneous modified polymer which led to an irregular catheter surface replete with fissures, pits, and cracks as well as sections of the catheter lumen which contain more than 30% barium sulfate by weight, reducing the catheter strength at those loci.

26.    The fissures, pits, and cracks on the catheter's surface can cause thrombosis by facilitating and promoting the collection/accumulation and further proliferation of fibrinous material circulating in one's bloodstream.

---

[1] See Hecker JF, Scandrett LA. Roughness and thrombogenicity of the outer surfaces of intravascular catheters. *J Biomed Mater Res*. 1985;19(4):381-395. doi:10.1002/jbm.820190404

COMPLAINT

27.     Although the surface degradation and resultant catheter-related thrombosis can be reduced or avoided with design modifications (e.g., using a higher grade radiopacity compound and/or encapsulating the admixed polymer within polyurethane), the Defendants elected not to incorporate those design elements into the SmartPort.

28.     At all times relevant to this action, the Defendants misrepresented the safety of the SmartPort system, and negligently designed, manufactured, prepared, compounded, assembled, processed, labeled, marketed, distributed, and sold the SmartPort system as safe and effective device to be surgically implanted to provide repeated access to the vascular system for the delivery of medications, intravenous fluids, parenteral nutrition solutions, and blood products.

29.     At all times relevant to this action, the Defendants knew or should have known that the SmartPort devices were not safe for the patients for whom they were prescribed and implanted, because once implanted, the devices were prone to facilitating and promoting the catheter-related thrombosis and otherwise malfunctioning.

30.     At all times relevant to this action, the Defendants knew or should have known that patients implanted with SmartPort had an increased risk of suffering life threatening injuries, including but not limited to: death; thrombosis; infections; hemorrhage; cardiac/pericardial tamponade (pressure caused by a collection of blood in the area around the heart); cardiac arrhythmia and other symptoms similar to myocardial infarction; severe and persistent pain; and perforations of tissue, vessels and organs, or the need for additional surgeries to remove the defective device.

31.     Soon after SmartPort was introduced to market, the Defendants began receiving large numbers of adverse event reports ("AERs") from healthcare providers reporting that

COMPLAINT

SmartPort was facilitating and promoting the catheter-related thrombosis. These failures were often associated with reports of severe patient injuries such as:

1. hemorrhage;

2. cardiac/pericardial tamponade;

3. infection/sepsis;

4. cardiac arrhythmia and other symptoms similar to myocardial infarction;

5. severe and persistent pain;

6. perforations of tissue, vessels, and organs; and

7. upon information and belief, death.

32.     In addition to the large number of AERs which were known to the Defendants and reflected in publicly accessible databases, there were many recorded device failures and/or injuries related to the Defendants' implantable port products which were concealed from medical professionals and patients through submission to the FDA's controversial Alternative Summary Reporting ("ASR") program.

33.     The FDA halted the ASR program after its existence was exposed by a multi-part investigative piece, prompting a widespread outcry from medical professionals and patient advocacy groups.[2]

34.     Prior to the discontinuation of the ASR program, the Defendants reported numerous episodes of failures of their implanted port/catheter products – including numerous episodes of the catheter-related thrombosis–under the ASR's exemption-thereby concealing them from physicians

---

[2] Christina Jewett, *Hidden Harm: Hidden FDA Reports Detail Harm Caused by Scores of Medical Devices*, Kaiser Health News (Mar. 2019)

COMPLAINT

and patients.

35.     The Defendants knew or should have known that the SmartPort devices had a substantially higher thrombosis rate than other similar products then on the market, yet the Defendants failed to warn physicians and consumers of this fact.

36.     The Defendants also intentionally concealed the severity of complications caused by the SmartPort devices and the likelihood of these events occurring.

37.     Rather than alter the design of the SmartPort to make it safer or adequately warn physicians of the dangers associated with the SmartPort, the Defendants continued to actively and aggressively market the SmartPort as safe, despite their knowledge of numerous reports of the catheter-related thrombosis and associated injuries.

38.     Moreover, the Defendants concealed—and continue to conceal—their knowledge of the SmartPort's dangerous propensity to precipitate the catheter-related thrombosis. The Defendants further concealed their knowledge that the catheter's design caused these failures and that these failures cause serious injuries.

39.     The conduct of the Defendants, as alleged in this Complaint, constitutes willful, wanton, gross, and outrageous corporate conduct that demonstrates a conscious disregard for the safety of MARSHALL LEVERETTE.

40.     The Defendants had actual knowledge of the dangers presented by the SmartPort system, yet consciously failed to act reasonably to:

        a.     Adequately inform or warn Plaintiff, her prescribing physicians, or the public at large of these dangers;

        b.     Establish and maintain an adequate quality and post-market surveillance

COMPLAINT

system; or

c.      Recall the SmartPort devices from the market.

**SPECIFIC FACTUAL ALLEGATIONS AS TO MARSHALL LEVERETTE**

41.     On or about July 6, 2010, Plaintiff underwent placement of an AngioDynamics' SmartPort product, Model #: 215990. Catalog NBR: CT80STPD, and Lot #: 513799, for the purposes of Plaintiff's chemotherapy.

42.     Upon information and belief, the aforementioned device's description is as follows: Smart Port CT Single Titanium Port System with Attachable 8.0F x 66 cm Polyurethane Catheter and 8F Introducer Kit.

43.     Upon information and belief, the device at issue was implanted by Dr. Randall W. Nichols, MD., at SEHE – Southeast Health, in Dothan, Alabama, for the purposes indicated above.

44.     The Defendants, directly or through their agents, apparent agents, servants, or employees designed, manufactured, marketed, advertised, distributed, and sold the SmartPort that was implanted in MARSHALL LEVERETTE.

45.     The Defendants manufactured, sold, and/or distributed the SmartPort to MARSHALL LEVERETTE, through her doctors, for Plaintiff's personal use.

46.     On or about March 5, 2017, upon information and belief, Plaintiff presented to the Cincinnati VA hospital, in Cincinnati, Ohio, with flu-like symptoms, which Plaintiff developed while travelling from Alabama to Cincinnati, Ohio.

47.     While in Cincinnati, OH, upon information and belief, Plaintiff came under medical care of Dr. Gary Guo Li, M.D. and Dr. Vincent T. Martin, M.D.

48.      Upon information and belief, Plaintiff had echocardiogram performed that

– 9 –

revealed the presence of right atrial mass, which Dr. Vincent T. Martin, M.D. qualified as "likely a thrombus at the tip of the port."

49.     Upon information and belief, on or about March 5, 2017, Plaintiff was transferred to the University of Cincinnati Medical Center.

50.     At the aforementioned facility, Plaintiff had Cardiac MRI performed. The Cardiac MRI at issue showed thrombus in Plaintiff's right atrium. Plaintiff's medical team confirmed that the thrombus at issue was a port-a-cath thrombus, and it connected the formation of said thrombus with Plaintiff's port-a-cath.

51.     Upon information and belief, on or about March 5, 2017, Plaintiff's medical team consulted with Cardiac Surgery and the port-a-cath removal was discussed.

52.     Upon information and belief, on or about March 5, 2017, Plaintiff was transferred back to the Cincinnati VA hospital for Plaintiff's port-a-cath removal surgery.

53.     On or about April 12, 2017, at Flowers Hospital in Dothan, Alabama, Dr. Joseph H. Graham, M.D., removed Plaintiff's port-a-cath at issue.

54.     On April 12, 2017, upon the removal of Plaintiff's port-a-cath at issue, upon information and belief, inflammation was diagnosed together with right atrial mass secondary to Plaintiff's port-a-cath.

55.     At all times relevant to this action, the SmartPort at issue was utilized and implanted in a manner foreseeable to the Defendants, as the Defendants generated the instructions for use and created procedures for implanting the product at issue.

– 10 –

COMPLAINT

56.    The SmartPort implanted in MARSHALL LEVERETTE was in the same or substantially similar condition as when it left the possession of the Defendants and in the condition directed by and expected by the Defendants.

57.    MARSHALL LEVERETTE and her physicians foreseeably used and implanted the SmartPort at issue and did not misuse or alter the SmartPort in an unforeseeable manner.

58.    The Defendants advertised, promoted, marketed, sold, and distributed the SmartPort as a safe medical device when the Defendants knew or should have known the SmartPort was not safe for its intended purposes and that the product could cause serious medical problems.

59.    The Defendants had sole access to material facts concerning the defective nature of the SmartPort product and its propensity to cause the catheter-related thrombosis.

60.    In reliance on Defendants' representations, MARSHALL LEVERETTE's doctors were induced to, and did use the SmartPort.

61.    As a result of having the SmartPort implanted, MARSHALL LEVERETTE has experienced significant pain and suffering, has undergone additional surgeries, and has suffered economic loss, including, but not limited to obligations for medical services and expenses.

62.    The Defendants' SmartPort devices were marketed to the medical community and to patients as safe, effective, and reliable medical devices implanted by safe and effective, minimally invasive surgical techniques for the treatment of medical conditions, and as safer and more effective as compared to the traditional products and procedures for treatment and other competing Vascular Access Devices.

– 11 –

COMPLAINT

63.    The Defendants have marketed and sold the SmartPort devices to the medical community at large and patients through carefully planned, multifaceted marketing campaigns and strategies. These campaigns and strategies include but are not limited to direct-to-consumer advertising, aggressive marketing to health care providers at medical conferences, hospitals, private offices, and/or group purchasing organizations, and include a provision of valuable consideration and benefits to the aforementioned.

64.    The injuries, conditions, and complications suffered due to the Defendants' SmartPort include, but are not limited to thrombosis, infections; necrosis; fracture and leakage; cardiac/pericardial tamponade; cardiac arrhythmia and other symptoms similar to myocardial infarction; severe and persistent pain; perforations of tissue, vessels and organs; and death.

65.    The Defendants were negligent towards MARSHALL LEVERETTE in the following respects:

a.    The Defendants failed to design and establish a safe, effective procedure for removing SmartPort; therefore, in the event of failure, injury, or complications it is difficult to safely remove SmartPort; and

b.    The Defendants provided incomplete, insufficient, and misleading information to physicians to increase the number of physicians using SmartPort for the purpose of increasing their sales. By so doing, the Defendants caused the dissemination of inadequate and misleading information to patients, including MARSHALL LEVERETTE.

66.    The SmartPort was utilized and implanted in a manner foreseeable to the Defendants.

COMPLAINT

67.    The SmartPort implanted into MARSHALL LEVERETTE was in the same or substantially similar condition as when it left the possession of the Defendants and in the condition directed by the Defendants.

68.    At the time of her operation, MARSHALL LEVERETTE was not informed of, and had no knowledge of the complaints, known complications and risks associated with SmartPort, including, but not limited to the extent of seriousness of the danger of the catheter-related thrombosis.

69.    MARSHALL LEVERETTE was never informed by the Defendants of the defective and dangerous nature of SmartPort.

70.    At the time of her implant, upon information and belief, neither MARSHALL LEVERETTE nor her physicians were aware of the defective and dangerous condition of the SmartPort.

71.    As a result of the Defendants' actions and inactions, MARSHALL LEVERETTE has been injured and has sustained economic and non-economic damages, both in the past and future, including for pain and suffering and medical expenses.

**COUNT I: NEGLIGENCE**
(Against Defendants AngioDynamics and Navilyst)

72.    Plaintiff incorporates the preceding paragraphs as if set out fully herein.

73.    The Defendants owed Plaintiff a duty to exercise reasonable care when designing, manufacturing, marketing, advertising, distributing, selling, and conducting post-market surveillance of the SmartPort.

74.    The Defendants failed to exercise due care under the circumstances and therefore breached this duty by:

– 13 –

COMPLAINT

a. Failing to properly and thoroughly test the SmartPort before releasing the device to market, and/or failing to implement feasible safety improvements.

b. Failing to properly and thoroughly analyze the data resulting from any pre-market testing of the SmartPort.

c. Failing to conduct sufficient post-market testing and surveillance of the SmartPort.

d. Failing to comply with state and federal regulations concerning the study, testing, design, development, manufacture, inspection, production, advertisement, marketing, promotion, distribution, and/or sale of the SmartPort;

e. Designing, manufacturing, marketing, advertising, distributing, and selling the SmartPort to consumers, including Plaintiff, without an adequate warning of the significant and dangerous risks of the SmartPort and without proper instructions to avoid the harm which could foreseeably occur as a result of using the device.

f. Failing to exercise due care when advertising and promoting the SmartPort; and

g. Negligently continuing to manufacture, market, advertise, and distribute the SmartPort after the Defendants knew or should have known of its adverse effects.

75. As a direct, actual, and proximate cause of the Defendants' actions, omissions, and misrepresentations, Plaintiff has been injured and has sustained economic and non-economic damages, both in the past and future, including for pain and suffering and medical expenses.

76. In performing the foregoing acts, omissions, and misrepresentations, the

Defendants acted grossly negligently, fraudulently, and with malice.

## COUNT II: STRICT PRODUCTS LIABILITY – DESIGN DEFECT
(Against Defendants AngioDynamics and Navilyst)

77.    Plaintiff incorporates the preceding paragraphs as if set out fully herein.

78.    The Defendants supplied, manufactured, sold, distributed and/or otherwise placed into the stream of commerce the SmartPort implanted into Plaintiff.

79.    The SmartPort implanted into Plaintiff was not reasonably safe for its intended use and was defective with respect to its design.

80.    The SmartPort was in a defective condition and was defective in its design in that when it left the possession and control of the Defendants, it was not safe for its anticipated use and safer, more reasonable alternative designs existed that could have been utilized by the Defendants.

81.    The SmartPort was unreasonably dangerous to the user or consumer, taking into consideration the utility of said product and the risks involved in its use. The foreseeable risks associated with the design of the product were more dangerous than a reasonably prudent consumer such as Plaintiff and/or her physicians would expect when the product was used for its normal and intended purpose.

82.    The SmartPort was expected to and did reach the consumer, i.e., Plaintiff in this action, without substantial change in the condition in which it was supplied, distributed, sold, and/or otherwise placed into the stream of commerce.

83.    A reasonably prudent medical device manufacturer would have recognized the defective design of the SmartPort and would have avoided placing it into the stream of commerce.

84.    The design defects in the SmartPort were not known, knowable and/or reasonably apparent to Plaintiff and/or her physicians, or discoverable upon any reasonable examination.

– 15 –

COMPLAINT

85.    The SmartPort was used and implanted in the manner in which it was intended to be used and implanted by the Defendants pursuant to the instructions for use and the product specifications provided by the Defendants.

86.    The Defendants are strictly liable to Plaintiff for designing, manufacturing, marketing, labeling, packaging, and selling a defective product.

87.    As a direct, actual, and proximate cause of the Defendants' actions, omissions, and misrepresentations, Plaintiff has been injured and has sustained economic and non-economic damages, both in the past and future, including for pain and suffering, and medical expenses.

88.    In performing the foregoing acts, omissions, and misrepresentations, the Defendants acted grossly negligently, fraudulently, and with malice.

## <u>COUNT III: STRICT PRODUCTS LIABILITY – FAILURE TO WARN</u>
(Against Defendants AngioDynamics and Navilyst)

89.    Plaintiff incorporates the preceding paragraphs as if set out fully herein.

90.    The Defendants designed, set specifications, manufactured, assembled, processed, marketed, labeled, distributed, and sold the SmartPort devices, including the one implanted in Plaintiff, into the stream of commerce, and in the course of the same, directly advertised and marketed the device to consumers or persons responsible for consumers, and therefore had a duty to warn of the risk of harm associated with the use of the device and to provide adequate instructions on the safe and proper use of the device.

91.    At the time the Defendants designed, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the device into the stream of commerce, the device was defective and presented a substantial danger to users of the product when put to its intended and reasonably anticipated use, namely as an implanted port-a-cath system

COMPLAINT

to administer intravenous fluids and/or medications.

92.    The Defendants failed to adequately warn of the device's known or reasonably scientifically knowable dangerous propensities and further failed to adequately provide instructions on the safe and proper use of the device.

93.    The Defendants knew or should have known at the time they manufactured, labeled, distributed, and sold the SmartPort that was implanted into Plaintiff that the SmartPort posed a significant and higher risk than other similar devices of the device-related thrombosis and resulting serious injuries.

94.    The Defendants failed to timely and reasonably warn of material facts regarding the safety and efficacy of the SmartPort; no reasonable healthcare provider, including the Plaintiff's, or patient, including Plaintiff, would have used the device at issue in the manner directed, had those facts been made known to the prescribing healthcare providers or to the consumers of the device.

95.    The warnings, labels, and instructions provided by the Defendants at all times relevant to this action, are and were inaccurate, intentionally misleading, and misrepresented the risks and benefits, and lack of safety and efficacy associated with the device.

96.    The health risks associated with the device, as described herein, are of such nature that ordinary consumers would not have readily recognized the potential harm.

97.    The SmartPort, which was designed, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold into the stream of commerce by the Defendants, was defective at the time of release into the stream of commerce due to inadequate warnings, labeling and/or instructions accompanying the product.

COMPLAINT

98.     When Plaintiff was implanted with the device, the Defendants failed to provide adequate warnings, instructions, or labels regarding the severity and extent of health risks posed by the device, as discussed herein.

99.     The Defendants intentionally underreported the number and nature of adverse events associated with the catheter-related thrombosis to Plaintiff's health care providers, as well as the FDA.

100.    Upon information and belief, neither Plaintiff nor her health care providers knew of the substantial danger associated with the intended and foreseeable use of the device, as described herein.

101.     Plaintiff and her health care providers used the SmartPort in a normal, customary, intended, and foreseeable manner, namely as a surgically placed device used to make it easier to deliver medications directly into the patient's bloodstream.

102.    Upon information and belief, the defective and dangerous condition of the SmartPort devices, including the one implanted into Plaintiff, existed at the time they were manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold by the Defendants to distributors and/or healthcare professionals or organizations.

103.    Upon information and belief, the SmartPort implanted in Plaintiff was in the same condition as when it was manufactured, inspected, marketed, labeled, promoted, distributed, and sold by the Defendants.

104.    The Defendants' lack of sufficient warnings and/or instructions is the direct and proximate cause of Plaintiff's serious physical injuries and economic damages in an amount to be determined at trial. Had the Defendants provided adequate warnings, Plaintiff and her physicians

would not have used the SmartPort at issue.

105.    As a direct, actual, and proximate cause of the Defendants' actions, omissions, and misrepresentations, Plaintiff has been injured and has sustained economic and non-economic damages, both in the past and future, including for pain and suffering and medical expenses.

106.    In performing the foregoing acts, omissions, and misrepresentations, the Defendants acted grossly negligent, fraudulently, and with malice.

## COUNT IV: BREACH OF IMPLIED WARRANTY
(Against Defendants AngioDynamics and Navilyst)

107.    Plaintiff incorporates the preceding paragraphs as if set out fully herein.

108.    The Defendants impliedly warranted that the SmartPort was merchantable and fit for the ordinary purposes for which it was intended.

109.    When the SmartPort was implanted in Plaintiff, it was being used for the ordinary purposes for which it was intended.

110.    Plaintiff, individually and/or by and through her physicians, relied upon the Defendants' implied warranties of merchantability in consenting to have the SmartPort implanted in her body.

111.    Privity exists between Plaintiff and the Defendants because Plaintiff's physicians acted as Plaintiff's purchasing agents in the subject transaction and/or because Plaintiff was a third-party beneficiary of the subject contract.

112.    Plaintiff was the intended consumer of the device at issue when the Defendants made the warranties set forth herein, and such warranties were made to benefit Plaintiff as a patient and consumer.

– 19 –

COMPLAINT

113.    The Defendants breached these implied warranties of merchantability because the SmartPort implanted in Plaintiff was neither merchantable nor suited for its intended uses as warranted in that the device varied from its intended specifications, which included, but are not limited to variances in the following respects:

a. The Defendants' manufacturing process in constructing the catheter of the SmartPort implanted in Plaintiff involved too high of a concentration of barium sulfate particles for the polymer formulation, which led to improperly high viscosity of the admixed polyurethane before polymerization and causing improper mixing of barium sulfate particles within the polymer matrix.

b. The Defendants knew or should have known that barium sulfate is known to contribute to a reduction in the mechanical integrity of the polyurethane in their product, the SmartPort, as the barium sulfate particles dissociate from the surface of the catheter over time; and

c. These defects led to a heterogenous modified polymer that included microfractures and weakened areas at the location of the higher barium sulfate concentration that led to the formation of fissures, pits, and cracks on the surface of the catheter at issue, which in turn caused thrombosis by facilitating and promoting the collection/accumulation and further proliferation of fibrinous material circulating in Plaintiff's bloodstream.

114. The Defendants' breaches of their implied warranties resulted in the implantation of an unreasonably dangerous and defective product, the SmartPort, into the Plaintiff's body, placing Plaintiff's health and safety in jeopardy.

COMPLAINT

115. The SmartPort was sold to Plaintiff's health care providers for implantation in patients, such as Plaintiff.

116. As a direct, actual, and proximate cause of the Defendants' actions, omissions, and misrepresentations, Plaintiff has been injured and has sustained economic and non-economic damages, both in the past and future, including for pain and suffering and medical expenses.

117. Upon information and belief, the Plaintiff's healthcare providers sent notice to the Defendants of the adverse event that occurred to Plaintiff and thus, the nonconformity of the SmartPort at issue, within a reasonable time following discovery of the breach of warranty and before suit was filed.

## COUNT V: BREACH OF EXPRESS WARRANTY
(Against Defendants AngioDynamics and Navilyst)

118. Plaintiff incorporates the preceding paragraphs as if set out fully herein.

119. The Defendants through their officers, directors, agents, representatives, and written literature and packaging, and written and media advertisement, expressly warranted that the SmartPort was safe and fit for use by consumers, was of merchantable quality, did not produce dangerous side effects, and was adequately tested and fit for its intended use.

120. The SmartPort did not conform to the Defendants' express representations because it was not reasonably safe, had numerous serious side effects, and caused severe and permanent injury.

121. The Defendants further breached express representations and warranties made to Plaintiff, her physicians and healthcare providers with respect to the SmartPort implanted in Plaintiff in the following respects:

– 21 –

COMPLAINT

a.  The Defendants represented to Plaintiff and her physicians and healthcare providers through labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory submissions, among other ways, that the SmartPort was safe, meanwhile the Defendants fraudulently withheld and concealed information about the substantial risks of serious injury associated with using the SmartPort;

b.  The Defendants represented to Plaintiff and her physicians and healthcare providers that the SmartPort was as safe and/or safer than other alternative procedures and devices then on the market, but fraudulently concealed information which demonstrated that SmartPort was not as safe and/or safer than alternative therapies and products then available on the market; and

c.  The Defendants presented to Plaintiff and her physicians and healthcare providers that the SmartPort was more efficacious than other alternative procedures, therapies, and/or devices then available on the market. Meanwhile, the Defendants fraudulently concealed information regarding the true efficacy of SmartPort.

122.    At all times relevant to this action, the SmartPort did not perform as safely as an ordinary consumer, e.g., Plaintiff in this action, would expect, when used as intended or in a reasonably foreseeable manner.

123.    Plaintiff, her physicians, and the medical community reasonably relied upon the Defendants' express warranties for the SmartPort.

124.    Privity exists between Plaintiff and the Defendants because Plaintiff's physicians

acted as Plaintiff's purchasing agents in the subject transaction and/or because Plaintiff was a third-party beneficiary of the subject contract.

125.    Plaintiff was the intended consumer of the SmartPort at issue when the Defendants made the warranties set forth herein, and such warranties were made to benefit Plaintiff as a patient and consumer.

126.    At all times relevant to this action, the SmartPort was used on Plaintiff by her physicians for the purpose and in the manner intended by the Defendants.

127.    Plaintiff and the Plaintiff's physicians, using reasonable care, could not have discovered the breached warranty and realized its danger.

128.    As a direct, actual, and proximate cause of the Defendants' actions, omissions, and misrepresentations, Plaintiff has been injured and has sustained economic and non-economic damages, both in the past and future, including for pain and suffering, and medical expenses.

129.    Upon information and belief, Plaintiff's healthcare providers sent notice to the Defendants of the adverse event that occurred to Plaintiff and thus, the nonconformity of the SmartPort at issue, within a reasonable time following discovery of the breach of warranty and before suit was filed.

### COUNT VI: FRAUDULENT CONCEALMENT
(Against Defendants AngioDynamics and Navilyst)

130.    Plaintiff incorporates the preceding paragraphs as if set out fully herein.

131.    The Defendants made false statements and representations to Plaintiff and her healthcare providers concerning the SmartPort product implanted in Plaintiff.

132.    The Defendants fraudulently concealed information with respect to the SmartPort

– 23 –

COMPLAINT

in the following respects:

    a.   The Defendants represented through the labeling, advertising, marketing materials, seminar presentations, publications, notice letters, and regulatory submissions that the SmartPort was safe, and fraudulently withheld and concealed information about the substantial risks of using the SmartPort, including, but not limited to its heightened propensity to precipitate thrombosis, and cause complications;

    b.   The Defendants represented that the SmartPort was safer than other alternative systems and fraudulently concealed information which demonstrated that the SmartPort was not safer than alternatives then available on the market.

    c.   The Defendants fraudulently concealed that they knew of the SmartPort's dangerous propensity to precipitate the catheter-related thrombosis; and

    d.   The frequency of these failures and the severity of injuries were substantially worse than had been reported by the Defendants.

133.    The Defendants knew or should have known that the representations they made concerning the SmartPort, as stated above, were false.

134.    The Defendants had sole access to material facts concerning the dangers and unreasonable risks of the SmartPort.

135.    The concealment of information by the Defendants about the risks of the SmartPort was intentional.

136.    The concealment of information and the misrepresentations about the SmartPort were made by the Defendants with the intent that the Plaintiff's health care providers and Plaintiff rely upon them.

– 24 –

COMPLAINT

137.    Plaintiff and her physicians relied upon the representations and were unaware of the substantial risks of the SmartPort which the Defendants concealed from the public, including Plaintiff and her physicians.

138.    As a direct and proximate result of the Defendants' actions, omissions and misrepresentations, Plaintiff has been injured and has sustained economic and non-economic damages, both in the past and future, including for pain and suffering and medical expenses.

139.    The Defendants acted with oppression, fraud, and malice towards Plaintiff.

140.    Had the Defendants not concealed this information, neither Plaintiff nor her health care providers would have consented to using the SmartPort implanted into Plaintiff.

## COUNT VII: VIOLATION OF THE OHIO PRODUCT LIABILITY ACT
(Against Defendants AngioDynamics and Navilyst)

141.    Plaintiff incorporates the preceding paragraphs as if set out fully herein.

142.    The port-a-cath at issue was defective with respect to its manufacture because when said device left the control of the Defendants, i.e., the manufacturers of said device, it deviated in a material way or in a number of material ways from the established design specifications and/or from the safety and efficacy standards as they applied to the port-a-cath at issue, and/or from the chemical composition as it applied to the manufacturing process of said device, and/or from identical SmartPort devices which have been manufactured by the Defendants, i.e., the manufacturers of the SmartPort devices, using the same established design specifications, the safety and efficacy standards, and the applicable chemical composition. *See* O.R.C. §2307.74.

143.    The port-a-cath at issue was defective with respect to its design because when said device left the Defendants' control, the risks associated with the SmartPort's design, which the Defendants knew or should have known about, and which were foreseeable to the Defendants, i.e.,

– 25 –

COMPLAINT

the manufacturers of the SmartPort's devices, outweighed the benefits associated with the use of the SmartPort's devices. *See generally* O.R.C. §2307.75.

144. At the time, the Defendants manufactured the SmartPort devices, including the one that was implanted into the Plaintiff's body, the alternative port-a-cath's designs, including the alternative chemical compositions, were available or feasible, and thus such alternative designs were capable of being realized by the Defendants.

145. Such alternative designs, e.g., using a higher grade radiopathy compound and/or encapsulating the admixed polymer within polyurethane, while allowing repeated access to the user's vascular system for the delivery of medications, intravenous fluids, etc., to serve the port-a-cath's intended purpose, would have prevented the harm foreseeable to the Defendants, i.e., the SmartPort's manufacturers, including the injuries sustained by Plaintiff in this action, as described above in this Complaint.

146. The Defendants, i.e., the manufacturers of the SmartPort devices, including the one implanted into the Plaintiff's body, had a duty to warn the public. *See* O.R.C. §2307.76.

147. The port-a-cath at issue was defective due to the lack of adequate warning(s) because the Defendants, i.e., the manufacturers of the SmartPort devices, including the one implanted into the Plaintiff's body, knew or should have known of the increased risk of the development of the SmartPort-related thrombosis.

148. The Defendants knew or should have known of the increased risk of the development of the SmartPort-related thrombosis and did fail to adequately warn the public about such risk. In its failure to warn, the Defendants failed to act as a reasonable manufacturer would have acted. The risk at issue was not an obvious risk or a matter of common knowledge: as

explained above in this Complaint, at the time of her implant, upon information and belief, neither Plaintiff nor Plaintiff's physicians knew of the defective and dangerous condition of the SmartPort or of the increased risk of the development of the SmartPort-related thrombosis.

149.    Per O.R.C. §2307.77, the port-a-cath at issue was defective because when it left the Defendants', i.e., the manufacturers' of said device's, control, it did not conform to the Defendants' representations made about the SmartPort devices.

150.    The Defendants represented through the labeling, advertising, marketing materials, publications, and regulatory submissions that the SmartPort devices were safe or safer than the alternatives then-available on the market. In fact, as shown in this Complaint, the SmartPort devices have higher propensity to precipitate the port-a-cath-related thrombosis and other complications, and thus the device at issue was defective as it did not conform to the Defendants' representations.

151.    As a direct, actual, and proximate cause of the manufacturing defect as it concerns the port-a-cath at issue, design defect, as it concerns the same, the Defendants' failure to warn, and the Defendants' failure to conform the port-a-cath at issue to said product's representations, Plaintiff has been injured and has sustained economic loss, including, but not limited to medical expenses, and non-economic loss, such as pain and suffering.

## **PRAYER**

**WHEREFORE**, Plaintiff prays for judgment against each of the Defendants as follows:

a.    Judgment be entered against all the Defendants on all causes of action of this Complaint.

b.    Plaintiff be awarded her full, fair, and complete recovery for all claims and causes of

action relevant to this action.

c.   Plaintiff be awarded general damages according to proof at the time of trial.

d.   Plaintiff be awarded damages, including past, present, and future medical expenses

according to proof at the time of trial.

e.   Plaintiff be awarded the applicable non-economic and economic damages under The

Ohio Product Liability Act. *See* O.R.C. §§ 2307.71-2307.80.

f.   Plaintiff be awarded punitive damages, under O.R.C. §2307.80., according to proof at

the time of trial.

g.   Awarding pre-judgment and post-judgment interest to Plaintiff.

h.   Awarding the costs and the expenses of this litigation to Plaintiff.

i.   For such other and further relief as the court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury on all issues.

Respectfully submitted,

**Constant Legal Group, LLP**

*/s/ Ryan Cavanaugh*
Ryan Cavanaugh
(OH Bar No. 0079996)
Edward J. Kelley, III
(OH Bar No. 0096082)
737 Bolivar Rd., Ste. 440
Cleveland, OH 44115
(216) 333-41119
(216) 274-9365 (facsimile)
ryan@constantllp.com
ed@constantllp.com

– 28 –

COMPLAINT

**Roman Balaban and Associates, LLC**

*/s/ Roman Balaban*_____
Roman Balaban (CO # 39148/*Pro Hac Vice*
Application is forthcoming)
Max Yefimenko (CO # 34796/*Pro Hac Vice*
Application is forthcoming)
Roman Balaban and Associates, LLC
7350 East Progress Place, Suite 106
Greenwood Village, CO 80111
Phone: 720-817-4040
Fax: 303-500-1713
Email: balaban@rbatort.com
Email: yefimenko@rbatort.com

*ATTORNEYS FOR PLAINTIFF*

– 29 –

COMPLAINT